IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UTAH TRANSIT AUTHORITY,<br><br>    Plaintiff,<br><br><br>    v.<br><br><br>LIBERTY MUTUAL INSURANCE COMPANY,<br><br>    Defendant. | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br><br><br><br>Case No. 2:04-CV-01072 PGC |

Defendant Liberty Mutual Insurance Company ("Liberty Mutual") filed a motion for summary judgment on several issues that will close this case. Specifically, Liberty Mutual argues that plaintiff Utah Transit Authority's ("UTA") failure to give timely notice of an occurrence that might give rise to a claim, and UTA's failure to obtain consent before assuming an obligation, incurring expenses, and settling its claim with the Utah Department of Transportation ("UDOT"), breaches the relevant insurance contract. For the reasons that follow, the court GRANTS Liberty Mutual's motion for summary judgment (#13) and orders this case to be closed.

**BACKGROUND**

When considering a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.[1]  Viewed in this light, the record reflects the following facts.

*A. The University TRAX Project*

In 1999, UTA entered into a Light Rail Transit Agreement ("LRT Agreement") with multiple parties, including UDOT.  The LRT Agreement related to the design and construction of a University TRAX line running east to west along 400 South and 500 South from Main Street to the University of Utah.  This line was to be connected with the previously constructed north-south running TRAX line.  UTA and other relevant parties anticipated that the construction would be completed prior to the 2002 Winter Olympic Games in Salt Lake City.  Indeed, UTA completed the project before the opening ceremony.  During the construction, however, UTA damaged a fiber optic system known as the Advanced Traffic Management System ("ATMS").  This fiber optic system, owned by UDOT, allows Salt Lake City and UDOT to better manage traffic by controlling traffic signals, cameras, and signs.

On June 9, 2000, UTA contracted with Salt Lake City Rail Constructors ("SLCRC") to act as the design builder and general contractor for the construction of the University TRAX line.  The contract between UTA and SLCRC ("Design/Build Contract") reads that UTA investigated many of the utilities likely to be impacted by the construction.  In the contract, SLCRC also acknowledges that UTA had not identified most of the ATMS lines leading off or

---

[1] *Cortez v. McCauley*, 438 F.3d 980, 988 (10th Cir. 2006).

feeding ATMS ductbanks, vaults, or service lines at the site and may not have identified all non-service utilities at the site. The Design/Build Contract further provides that SLCRC would take actions necessary to establish the existence, size, and exact location of all ATMS lines feeding or leading off ATMS ductbanks, vaults, and service lines in areas impacted by the construction work.

The Design/Build Contract also indicated that UTA had already entered, or would enter into utility agreements with some utility owners for the relocation of utilities. Although UTA did not enter into a distinct utility agreement with UDOT, the LRT Agreement signed by UTA and UDOT contains the following provisions relating to the ATMS line:

> SECTION 02845
> 3.1     Construction Requirements
> . . .
> H. The Contractor shall preserve and protect the existing ATMS system where possible. Any damage to the existing ATMS system shall be replaced. . . . The Contractor shall repair the fiber in a time frame that is acceptable to UDOT.
> . . .
>
> SECTION 16770
> 1.1     SUMMARY
> 3. As part of the light rail line work, the Contractor shall ensure that all backbone and distribution fiber lines are protected during the period of light rail construction and kept in service at all times, unless approved by the owning agency. Fiber lines damaged by the Contractor's operations shall be replaced or repaired immediately at the Contractor's expense.[2]

*B. The Insurance Policy*

On or around June 9, 2000, UTA obtained insurance from Liberty Mutual under the Commercial Liability Policy and the Owner-Controlled Consolidated Insurance Program

---

[2] LRT Agreement, App. A to Ex. H, UDOT Construction Specification, UTA0290-UTA0293, UTA0365UTA0377, UTA0386-UTA0399, Ex. "C" to Decl. of Rebecca L. Hill [hereinafter LRT Agreement].

("OCIP").  The OCIP included a general liability insurance policy with a $250,000 deductible and an effective date of 6/9/00 to 1/9/2002 (the "CGL Policy").  Section IV of the CGL Policy specifies the duties of the insured in the event of an occurrence, offense, claim, or suit.[3]  This section requires UTA to "see to it that [Liberty Mutual] is notified as soon as practicable of an 'occurrence' or an offense which may result in a claim."[4]  Additionally, UTA is to notify Liberty Mutual as soon as practicable if "a claim is made or 'suit' is brought against [UTA]."[5]  The section also provides that "[n]o insured will, except at insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without [Liberty Mutual's] consent."[6]

*C. The Damage to the ATMS*

The construction project began in the summer of 2000, with excavation work occurring through the winter of 2001.  During the excavation work, UTA documented eight incidents of damage to ATMS conduits or cables.  The documented damage events occurred on July 28, 2000, August 25, 2000, October 26, 2000, November 8, 2000, November 28, 2000, December 13, 2000, December 29, 2000, and, February 28, 2001.  After each event, UTA placed temporary fixes to keep the ATMS functional, especially given that the ATMS controlled the traffic patterns throughout the Salt Lake Valley.  Although SLCRC provided notice to Liberty Mutual of the November 8, 2000, occurrence, there is no record that any entity provided specific notice to

---

[3] CGL Policy, Commercial General Liability Coverage Form at p. 14 of 24, Doc No. LM0355, Ex. "S" to Decl. of Rebecca L. Hill [hereinafter CGL Policy].

[4] CGL Policy at IV.2(a).

[5] CGL Policy at IV.2(b).

[6] CGL Policy at IV.2(d).

Liberty Mutual for the seven other ATMS damage events reported to UTA.

On November 8, 2000, a SLCRC worker severed the ATMS cable. Five days later, SLCRC sent a fax detailing the incident to Erinn Sa at Marsh USA, the insurance brokerage firm responsible for the UTA policy with Liberty Mutual. The fax included a page captioned "General Liability Notice of Occurrence/Claim." This page contained the following depiction: "Backhoe operator Doug Yamamoto was excavating a trench for fire hydrant installation. While excavating trench he hit a fiber optics line owned by UDOT."[7] On November 15, 2000, Erinn Sa faxed this form to Liberty Mutual. Liberty Mutual opened a claim for UTA based on the information provided in the November 15, 2000 fax. Liberty Mutual paid $4,747 for the repair of the ATMS line resulting from the November 8, 2000 occurrence, and then closed the claim in January 2001.

### D. Replacement of the ATMS Line

On February 2, 2001, Robert Gardner wrote in an email to Dan Chilton, a Liberty Mutual employee, that "John" had informed Mr. Gardner "that the main concern this week seemed to be the fairly high number of times that utility lines have been hit by backhoes."[8] Also on February 2, 2001, UTA held a meeting with UDOT, SLCRC, High Desert Electric, and the Federal Communications Group to discuss the existing damage to the ATMS line and the protection of three ATMS boxes. The group did not agree to replace the ATMS line, but the group did talk about the possibility that replacement might be necessary. The Federal Communications Group indicated at the meeting that it would cost $150,000 to replace the whole line. Liberty Mutual

---

[7] Exhibit 1 to Affidavit of Daniel Chilton ("Chilton Aff.").

[8] Exhibit 5 to Declaration of Emily V. Smith ("Smith Decl.").

representatives did not attend this meeting, nor was anyone from Liberty Mutual informed about this meeting prior to receiving a claim on the insurance policy.

Sometime after the meeting, UDOT informed UTA that replacement of the ATMS backbone and distribution lines would be necessary. UTA directed SLCRC to replace a portion of the ATMS line. SLCRC subcontracted High Desert Contractors ("High Desert") to do the replacement work. High Desert in turn subcontracted the work to the Federal Communications Group, Fibertel, and Sorenson Construction to complete the ATMS repair. SLCRC assumed management of the work after High Desert experienced financial difficulties completing the work. Liberty Mutual did not conduct an investigation or adjustment prior to the repair of the ATMS system, nor was it informed by any of the relevant parties about the ATMS repair work.

The replacement work began July 2001 and continued until December of that year. According to the record, the relevant parties performed this work on a time and materials basis, where the contractor charges for the hours and materials required to complete the job. Around the time of completion, UTA received time and materials invoices from SLCRC. These invoices informed UTA that the cost of replacement would likely exceed the deductible amount of its insurance policy with Liberty Mutual. By March 2002, UTA confirmed the accuracy of the invoices and was certain the cost would exceed the deductible. The cost of the replacement work came to $587,440.67, with a ten percent markup for SLCRC according to the Design/Build Contract, but UTA actually seeks $534,184.18 from Liberty Mutual after subtracting the cost of controller work.

*E. The March 2002 Notice of Insurance Claim*

On March 21, 2002, almost three months after the parties completed the ATMS repair work, Liberty Mutual acknowledged the receipt of UTA's official notice of insurance claim. The

claim stated that the date of the incident was July 1, 2001, but the Daily Audit reports submitted by the parties do not show an event on that specific date. After receiving the claim, Liberty Mutual assigned Brian Dickey to investigate the claim. On April 8, 2002, UTA supplied documentation in support of its claim to Liberty Mutual. Mr. Dickey investigated the claim to see whether the claim fell within the business risk exclusions for property damage of the insurance policy.

In a letter dated May 17, 2002, Mr. Dickey notified UTA that he believed the claim fell within the business risk exclusion for property damage to "that particular part of any property that must be restored, repaired, or replaced because 'your work' was incorrectly performed on it."[9] Thereafter, UTA submitted more information and documentation, including the Daily Audit reports, to support its claim. In December 2002, UTA paid SLCRC for the replacement work.

On September 5, 2003, after Liberty Mutual had received and reviewed UTA's information and documentation, and after Liberty Mutual had conducted further investigations, Liberty Mutual reiterated its position to UTA that the claim fell within the exclusion. This letter also informed UTA that Liberty Mutual believed that the condition requiring notice of occurrence and the condition prohibiting payment without consent had been breached by UTA. On October 13, 2003, UTA sent a letter to Mr. Dickey at Liberty Mutual disputing his conclusions and requesting a definitive response to its insurance claim. In a letter dated November 14, 2003, Liberty Mutual responded to UTA's letter and reiterated its earlier position. The denial of the claim became a matter of court record on December 27, 2005, through one of Liberty Mutual's responses to UTA's interrogatories.

---

[9] Correspondence from Brian Dickey to Genesis Eakes, dated May 17, 2002, Doc. Nos. LM0017-LM0018, Ex. "P" to the Declaration of Rebecca L. Hill.

**STANDARD OF REVIEW**

Courts may appropriately grant summary judgment "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."[10] Where the defendant seeks summary judgment on the basis of affirmative defenses, as Liberty Mutual does in this case, the defendant "must demonstrate that no disputed material fact exists regarding the affirmative defense asserted."[11] If Liberty Mutual meets this initial burden, UTA must then demonstrate with specificity the existence of a disputed material fact.[12] If UTA fails to make such a showing, Liberty Mutual's affirmative defenses – breach of notice and breach of voluntary payment provision – will bar UTA's claim, and Liberty Mutual will be entitled to summary judgment as a matter of law.[13]

**DISCUSSION**

Liberty Mutual seeks summary judgment on two affirmative defenses. First, Liberty Mutual alleges that UTA breached the notice provisions of the CGL Policy. Specifically, Liberty Mutual argues that UTA breached its obligation to both "see to it that [Liberty Mutual] [is] notified as soon as practicable of an 'occurrence' or an offence which may result in a claim,"[14] and timely notify Liberty Mutual if "a claim is made or 'suit' is brought against [UTA]."[15]

---

[10] *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] CGL Policy at IV.2(a).

[15] CGL Policy at IV.2(b).

Liberty Mutual's second affirmative defense is that UTA failed to obtain consent before voluntarily assuming an obligation, incurring expenses, and settling its claim with UDOT.  UTA argues that it provided reasonable notice to Liberty Mutual, and that Liberty Mutual failed to act on information it had about the ATMS line.  UTA also argues that Liberty Mutual has failed to show any prejudice as a result of the allegedly late notice.

### A. UTA Breached at Least One of the Notice Provisions of the CGL Policy

Liberty Mutual asserts that UTA breached the notice provisions of the policy contract because UTA failed to timely notify Liberty Mutual of an occurrence which might give rise to a claim and failed to timely notify Liberty Mutual of its claim with UDOT.  Thus, there are two notice provisions at issue.  The first issue is whether UTA satisfied its obligation to notify Liberty Mutual "as soon as practicable" of the occurrence that led to the claim.  UTA argues that it satisfied this obligation because it timely provided Liberty Mutual with notice of the November 8th occurrence, and language in the LRT Agreement – stating that "[a]ny damage to the existing ATMS system shall be replaced"[16] – put Liberty Mutual on notice that the entire ATMS line may need to be replaced.   The second notice issue is whether UTA notified Liberty Mutual "as soon as practicable" of UDOT's claim against it.  UTA argues that it satisfied this notice requirement because it informed Liberty Mutual of UDOT's claim against it as soon as it became aware that the replacement of the ATMS line would cost more than the $250,000 policy deductible.  Coupled with their respective arguments regarding the notice provisions, is the issue of prejudice.  Although Utah case law is unclear as to whether insurance companies are "required as a matter of

---

[16] LRT Agreement at 02845, 3.1.H.

law to prove facts supporting a finding of actual prejudice"[17] in order to prevail on summary judgment, the court will use this standard when addressing the prejudice issues raised by the parties.

As is discussed below, the court agrees with Liberty Mutual that UTA failed to satisfy its obligation to notify Liberty Mutual "as soon as practicable" of the occurrence that led to the claim. The court also finds that Liberty Mutual was prejudiced as a result of this lack of notice. Because of these findings, the court will not discuss UTA's alleged failure to timely notify Liberty Mutual of UDOT's claim against UTA.

**1. UTA failed to notify Liberty Mutual as soon as reasonably practicable of the occurrences that gave rise to the current claim.**

The first issue to be resolved is whether UTA timely notified Liberty Mutual of the occurrences that gave rise to the claim to replace the ATMS line. The pertinent provision of the CGL Policy reads that UTA "must see to it that [Liberty Mutual] [is] notified as soon as practicable of an 'occurrence' or an offense which may result in a claim."[18] Under Utah law, the notice standard states:

> failure to give any notice or file any proof of loss required by the policy within the time specified in the policy does not invalidate a claim made by the insured, if the insured shows that it was not reasonably possible to give the notice or file the proof of loss within the prescribed time and that notice was given or proof of loss filed as soon as reasonably possible.[19]

---

[17] *Busch Corp. v. State Farm Fire & Cas. Co.*, 743 P.2d 1217, 1220 (Utah 1987).

[18] CGL Policy at IV.2(a).

[19] Utah Code Ann. § 31A-21-312(1)(b) (2005).

On November 15, 2000, UTA's insurance brokerage firm sent Liberty Mutual a fax that detailed the ATMS damage that took place on November 8, 2000. Liberty Mutual does not dispute that UTA satisfied its notice of occurrence obligation with regard to the November 8th occurrence. Less clear is whether this notice of a single occurrence of damage to the fiber optic line can serve as adequate notice of a potential claim for the complete replacement of the ATMS line – a replacement that was necessitated by several actions resulting in damage to the line. The ATMS line had been severed on multiple occasions, both before and after the November 8th incident. UTA failed to provide Liberty Mutual with notice of these other "occurrences" in accordance with the CGL Policy. Also, UTA has failed to show that "it was not reasonably possible to give the notice . . . within the prescribed time and that notice was given . . . as soon as reasonably possible."[20] Liberty Mutual established a claim as a result of the November 8th occurrence, and paid $4,747.00 for the repair of the fiber optic line that was the subject of this notice. This claim was closed in January 2001.

UTA's reliance on language in the LRT Agreement – that "[a]ny damage to the existing ATMS system shall be replaced"[21] – provides little help to its argument that the November 8th notice of occurrence satisfied its notice obligations. First, the November 8th notice of occurrence involved around $5,000 worth of damage to the ATMS line. This is an amount that is more than 100 times smaller than the current claim. More importantly, in response to the November 8th notice of occurrence, Liberty Mutual established a claim, paid for the repair of the line, and then closed the claim. Even if Liberty Mutual was fully cognizant of the LRT Agreement language, Liberty Mutual's payment of $4,747.00 ended its obligation with regard to the November 8th

---

[20] Utah Code Ann. § 31A-21-312(1)(b).

[21] LRT Agreement at 02845, 3.1.H.

occurrence. As the court previously analogized at the hearing on this motion, arguing that Liberty Mutual was on notice for the complete replacement of the ATMS line would be like arguing that a doctor should be on notice for a shoulder, hip, and knee injury because she previously treated the patient for a hang-nail.

UTA's March 2002 notice of claim also fails to satisfy its obligation under Section IV(2)(a) of the CGL Policy. The CGL Policy requires the insured to file both a notice of a claim as well as a notice of occurrence. The March 2002 notice was not a notice of occurrence under Section IV(2)(a) of the CGL Policy; rather, it was a notice of a claim brought against UTA, and filed in accordance with Section IV(2)(b) of the CGL Policy. Even if one were to construe the March 2002 notice of claim as doubling as a notice of occurrence, UTA clearly failed to file this notice of "occurrence" as soon as reasonably possible, and has failed to show that it was not reasonably possible to give notice within the prescribed time.

Consequently, UTA breached its obligation under Section IV(2)(a) of the CGL Policy when it failed to notify Liberty Mutual of the occurrences that resulted in the current claim. The November 8th notice of occurrence and the March 2002 notice of claim both failed to satisfy UTA's notice obligations under the CGL Policy. Not only did UTA breach this notice provision, but the record demonstrates that Liberty Mutual was substantially prejudiced by UTA's actions.

### 2. Liberty Mutual was substantially prejudiced by UTA's failure to give notice.

A growing number of state courts have adopted the rule that an insurer may not deny coverage to an insured based on untimely notice unless the insurer was substantially prejudiced as a result of the delay.[22] Title 31A of the Utah Code provides that "[f]ailure to give notice or file

---

[22] *See, e.g., State Farm Mut. Auto. Ins. Co. v. Green*, 89 P.3d 97, 104 (Utah 2003).

proof of loss as required by Subsection (1)(b) does not bar recovery under the policy if the insurer fails to show it was prejudiced by the failure."[23] Both parties cite to *Busch v. State Farm Fire & Cas. Co.* as controlling law with regard to prejudice.[24] In *Busch*, the Utah Supreme Court addressed the issue of prejudice by stating: "assuming arguendo that we were to adopt plaintiff's foremost-urged contention and presume that the insurance companies were required as a matter of law to prove facts supporting a finding of actual prejudice, the unopposed affidavits filed in support of the motion met this standard . . . ."[25] The insurer in *Busch* established prejudice by submitting affidavits showing it was not provided with the opportunity to investigate, defend, and resolve the claim.[26] The court will look to the standard used in *Busch* to address the issue of prejudice in this case.

Like the insurer in *Busch*, Liberty Mutual was prejudiced by untimely notice. As a result of UTA's failure to timely notify Liberty Mutual of the occurrences that led to the current claim, Liberty Mutual did not have the opportunity to investigate the current claim, participate in the decision to replace the ATMS line, or defend against the loss. Also like the insurer in *Busch*, Liberty Mutual has submitted affidavits that prove facts supporting a finding of actual prejudice.[27] By the time Liberty Mutual received the March 2002 claim notice, the decision to

---

[23] Utah Code Ann. § 31A-21-312(1)(b).

[24] 743 P.2d 1217 (Utah 1987).

[25] *Id.* at 1220.

[26] *Id.* at 1219.

[27] *See, e.g.,* Affidavit of Brian Dickey ("Dickey Aff.").

replace the ATMS line had been made, the work was completed, and the bills had been reviewed. As Brian Dickey notes in his affidavit:

> Because of the late notice, Liberty Mutual could not: a) examine the incident scenes; b) properly interview witnesses; c) examine or assess the damage to the ATMS; d) determine the need for full replacement of the ATMS; e) determine the reasonable cost for resolution of the claim; and/or f) retain forensic specialists to assess liability and damage, all of which, are now impossible to do.[28]

As was more fully discussed above, the November 8th notice of occurrence satisfied UTA's notice obligations only as to the November 8th incident. This notice did not give Liberty Mutual the opportunity to investigate, defend, and resolve the claim to replace the entire ATMS line. The court also agrees with Liberty Mutual's contention that it is irrelevant that the outcome could conceivable have been the same had Liberty Mutual been involved at an earlier point. At this juncture, of course, no one can know for certain what the outcome would have been had Liberty Mutual been involved earlier. But it is known for certain that Liberty Mutual was denied an opportunity to investigate, defend, and resolve a significant claim where there were plausible reasons for believing that these actions might well have produced a more favorable outcome to Liberty Mutual. It was therefore prejudiced by UTA's breach of the notice provision.

Liberty Mutual has demonstrated that "no disputed material fact exists regarding the affirmative defense asserted,"[29] and UTA has not demonstrated with specificity the existence of a disputed material fact. Thus, as a matter of law, the court finds it appropriate to grant Liberty

---

[28] Dickey Aff. ¶ 18.

[29] *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997).

Mutual's motion for summary judgment on this issue. The court declines at this time to discuss UTA's failure to timely notify Liberty Mutual of UDOT's claim against UTA.

### B. UTA Breached the Voluntary Payment/Obligation Provision

The next issue is whether UTA breached the voluntary payment/obligation provision when it agreed to replace the ATMS line and directed SLCRC to perform the replacement work. The pertinent policy provision states: "No insured will, except at the insured's own cost, voluntarily make payment, assume any obligation, or incur any expense, other than for first aid, without our consent."[30] The enforcement of this type of provision appears to be a matter of first impression for Utah courts. However, Liberty Mutual directs the court to numerous jurisdictions which hold that voluntary payment provisions are enforceable as a matter of law.[31] UTA cites Tenth Circuit law stating that in determining whether to enforce such a provision, the critical questions "are factual: whether the insurer has denied liability or has failed to exercise diligence, good faith, and conscientious fidelity in safeguarding the interests of the insured."[32] The court is persuaded to enforce this policy provision but will be sensitive to whether Liberty Mutual failed to exercise good faith in safeguarding the interests of UTA.

UTA failed to obtain Liberty Mutual's consent prior to voluntarily assuming an obligation and incurring expenses. In the early summer of 2001, UTA assumed the obligation and incurred the expense of replacing the ATMS line. This was done without obtaining Liberty Mutual's

---

[30] CGL Policy at IV.2(d).

[31] *See, e.g., Vincent Soybean & Grain Co. v. Lloyd's Underwriters of London*, 246 F.3d 1129 (8th Cir. 2001).

[32] *Franklin v. Oklahoma City Abstract and Title Co.*, 584 F.2d 964 (10th Cir. 1978).

consent or even notifying the insurance company of UTA's actions.  This was a clear violation of the voluntary payment/obligation provision of the CGL Policy.

UTA argues that the cases cited by Liberty Mutual are inapplicable because none of those courts enforced the provision where the insured provided notice of the occurrence giving rise to the claim.  This argument is unpersuasive because UTA's November 8th notice of occurrence did not qualify as notice of the current claim, and the March 2002 claim was submitted after UTA had voluntarily assumed an obligation and incurred expenses.  UTA also points to the November 8th notice of occurrence, and Liberty Mutual's alleged failure to respond or undertake an investigation, as support that Liberty Mutual failed to exercise diligence, good faith, and conscientious fidelity in safeguarding the interests of the insured.  These arguments are wholly unpersuasive given the fact that Liberty Mutual paid the claim resulting from the November 8th notice of occurrence.

There is also a dispute as to whether an insured can voluntarily settle a general liability claim once the insurer has denied the claim.[33]  The court declines to address this issue because UTA's assumption of obligation and incurment expenses occurred before Liberty Mutual had even received notice of the claim, let alone denied it.

Although it is unclear whether Liberty Mutual must show prejudice as a result of this breach of the voluntary payment/obligation provision,[34] Liberty Mutual has made such a showing, for the reasons discussed in the previous section.  Because UTA failed to notify and

---

[33] *See Gibbs M. Smith, Inc. v. United States Fid. & Guar. Co.*, 949 P.2d 337 (Utah 1997).

[34] *See Champion Spark Plug Co. v. Fidelity and Cas. Co. of New York*, 687 N.E.2d 785 (Ohio Ct. App. 1996).

obtain consent from Liberty Mutual before assuming an obligation and incurring expenses, Liberty Mutual was denied an opportunity to investigate, defend, or resolve the issue. Of course, it was this opportunity that it had specifically bargained for.

Finally, Liberty Mutual attacks UTA's apparent admission that the current claim is in reality a first-party claim for its own property damage.[35] Such a claim is in conflict with the concept of general liability insurance where the coverage "is limited to providing insurance for third-party claims made against insureds, not claims made by the insured itself."[36]

Liberty Mutual has demonstrated that "no disputed material fact exists regarding the affirmative defense asserted,"[37] and UTA has not demonstrated with specificity the existence of a disputed material fact. Thus, as a matter of law, the court finds it appropriate to grant Liberty Mutual's motion for summary judgment on this issue.

## CONCLUSION

Given the foregoing discussion, the court GRANTS Liberty Mutual's motion for summary judgment (#13). The Clerk's Office is directed to close this case.

SO ORDERED.

DATED this 18th day of October, 2006.

---

[35] Pl.'s Reply Mem. Supp. Summ. J. at 11 (citing Def.'s Mem. Opp. Summ. J. at n.2).

[36] Pl.'s Reply Mem. Supp. Summ. J. at 11.

[37] *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997).

BY THE COURT:

_____

Paul G. Cassell

United States District Judge